# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON


JOHN W. BRATCHER,                    :

                     Plaintiff,                          Case No. 3:08-cv-335

                                                         District Judge Walter Herbert Rice
                                                         Magistrate Judge Michael R. Merz
        -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                              Defendant.          :

---

## REPORT AND RECOMMENDATIONS

---

        Plaintiff brought this action pursuant to 42 U.S.C. §405(g), as incorporated into 42

U.S.C. §1383(c)(3), for judicial review of the final decision of Defendant Commissioner of Social

Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case

is now before the Court for decision after briefing by the parties directed to the record as a whole.

        Judicial review of the Commissioner's decision is limited in scope by the statute

which permits judicial review, 42 U.S.C. §405(g).  The Court's sole function is to determine whether

the record as a whole contains substantial evidence to support the Commissioner's decision.  The

Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938);  *Landsaw v.

Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).  Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for supplemental security income SSI benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits

prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 . If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

A recipient of disability bears a continuing burden to show that he or she is disabled. *See, Mathews v. Eldridge,* 324 U.S. 319, 336 (1976); *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 n.1 (6th Cir, 1994). A recipient of disability benefits will be found to be no longer disabled if there has been medical improvement in his or her impairments since the time of the most recent favorable determination, other than improvement that is not related to the recipient's ability to work and the recipient is not able to engage in substantial gainful activity. *See,* 42 U.S.C. §423(f). In determining whether a recipient's entitlement to disability benefits has ended,

the Commissioner uses an eight-step sequential evaluation process. *See,* 20 C.F.R. §404.1594(f)(1)-(8); *see also, Johnson v. Secretary of Health and Human Services,* 948 F.2d 989, 991 (6th Cir. 1991). That the claimant currently not be engaged in "substantial gainful activity," is the first step in the sequential evaluation process for determining that disability has ended. *See, Id.* The other steps can summarized as follows: (2) If not engaged in substantial gainful employment, does the recipient have an impairment which would result in a new finding of disability? (If yes, the disability is found to be continuing.). (3) If no, has there been medical improvement in the condition which was originally found to be disabling? (If no, the disability is usually found to continue). (4) If there has been medical improvement, is it related to the ability of the recipient to do work? (If no, disability is probably found to be continuing, subject to step 5). (5) This step contains the exceptions to continuing disability even when no medical improvement is found in step 3 or the improvement is not related to ability to do work in step 4. (6) If medical improvement is shown, is the recipient's current impairment nonetheless severe? (If no, disability ceases). (7) If the current impairment is severe, can the recipient do the work which he did before determined to be disabled? (If yes, the disability ceases). (8) If the recipient cannot do the work done in the past, can the recipient do other work?

Plaintiff filed an application for SSI in April, 1999, alleging disability due to bipolar, manic depression, schizophrenia, and lower back pain. (Tr. 116). Plaintiff's application was granted with an onset date of April 1, 1999, on the basis that he met Listing 12.04. *See* Tr. 34. The Commissioner conducted a continuing disability review and, based on that review, determined that Plaintiff's disability ceased on July 20, 2005, because he no longer met Listing 12.04 and he was therefore no longer disabled. (Tr. 35, 40-43). Plaintiff's initial request for hearing was dismissed

4

due to a procedural issue and the Appeals Counsel remanded the claim for further proceedings. (Tr. 78-80). A hearing was held before a hearing officer who upheld the cessation of disability. (Tr. 44-59).

During that time, Plaintiff filed a new application for SSI on November 27, 2006, alleging disability from April 1, 1999. *See* Tr. 95-100. Plaintiff's application was denied initially and on reconsideration. (Tr. 38-39). The Commissioner consolidated this application with Plaintiff's appeal of the cessation of his benefits. *Id.*

On remand of Plaintiff's benefit cessation claim and on consideration of his November, 2006, application, a hearing was held before Administrative Law Judge David A. Redmond, (Tr. 919-38), who determined that Plaintiff's disability ended on July 20, 2005, and that Plaintiff has not become disabled since that date. (Tr. 18-27). The Appeals Council denied Plaintiff's request for review, (Tr. 7-9), and Judge Redmond's decision became the Commissioner's final decision.

In determining that Plaintiff is not entitled to benefits, Judge Redmond found that the most recent favorable medical decision finding that Plaintiff was disabled is the determination dated October 28, 1999, known as the comparison point decision (CPD). (Tr. 20, ¶ 1). Judge Redmond also found that at the time of the CPD, Plaintiff had an affective disorder and degenerative disk disease and that the affective disorder met Listing 12.04. *Id.*, ¶ 2. Judge Redmond found further that as of July 20, 2005, Plaintiff had degenerative disk disease of the lumbosacral [spine] with residuals of remote surgery, mild degenerative disc disease of the cervical spine, leg length discrepancy with mechanical low back pain, a history of seizure disorder, bipolar disorder, and a history of polysubstance abuse in current remission. *Id.*, ¶ 3. Judge Redmond then found that since July 20,

2005, Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings and that he had consequently experienced a significant medical improvement by July 20, 2005, which improvement was related to his ability to work. (Tr. 23, ¶ 4, 5, 6). Judge Redmond also found that as of July 20, 2005, Plaintiff has continued to have a severe impairment or combination of impairments. *Id*., ¶ 7. Judge Redmond determined that as of July 20, 2005, Plaintiff has the residual functional capacity to perform a limited range of light work. (Tr. 23-24, ¶ 8). Judge Redmond then used section 202.17 of the Grid as a framework for deciding, coupled with a vocational expert's testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 26, ¶ 13). Judge Redmond concluded that Plaintiff's disability ended on July 20, 2005, and that he has not become disabled again since that date. (Tr. 27, ¶ 14).

As noted above, Plaintiff has a history of affective disorders and the Commissioner found that he was disabled during the period April 1, 1999, through July 20, 2005, as a result of that impairment.

Plaintiff began experiencing low back pain in December, 1997. (Tr. 331). In January 1998, he underwent a hemilaminectomy for a protruded disc at L5-S1. (Tr. 247-60). Postoperatively, Plaintiff continued to complain of pain in the low back for which he underwent medication management, (Tr. 331), and by November 3, 1998, he reported only intermittent low back pain and left lower extremity pain. (Tr. 360).

In 1998, Plaintiff was hospitalized three times for prescription drug overdoses. (Tr. 261-270, 280-283, 290-315, 335, 352-358). During those hospitalizations, it was noted that Plaintiff had a lengthy history of mental illness and drug/alcohol abuse, that he started using alcohol and

marijuana at age 13, experimented with acid, snorted cocaine, may have used heroin, and that he had abused prescription drugs since 1996. *Id.* Over time, Plaintiff's psychiatric diagnoses were identified as bipolar disorder, prescription drug abuse, polysubstance abuse, personality disorder NOS, rule out antisocial personality disorder, rule out anxiety disorder, and rule out psychotic features. *Id.*

Plaintiff began receiving treatment from psychiatrist Dr. Fiacable in January, 1999. (Tr. 366). Dr. Fiacable reported that Plaintiff was very erratic in keeping his appointments and appeared to have marginal functioning in almost all areas. *Id.* Dr. Fiacable further reported that Plaintiff required continued medications to maintain stability, noting that in the past Plaintiff had tried Risperdal, Depakote, Lithium, Haldol, and Prozac. *Id.* Dr. Fiacable noted that Plaintiff was not stable enough to maintain himself in a job-type setting without potential risk for regression and that he was still trying to stabilize Plaintiff with medications. *Id.*

Examining psychologist Dr. Kramer reported in July, 1999, that Plaintiff complained he was disabled due to bipolar disorder and mood swings. (Tr. 367-71). Dr. Kramer noted that Plaintiff reported that he has taken medication for his bipolar disorder for over 20 years, that he was poorly dressed and groomed, he did not demonstrate any thought disorder, and that he appeared to function in the dull normal to borderline range of intelligence. *Id.* Dr. Kramer noted that overall, Plaintiff came across as a man with a lifelong history of significant psychiatric, personality, and social difficulties which had resulted in a very unstable work history and that he appeared to have a very poor tolerance of stress and poor frustration tolerance. *Id.* Dr. Kramer identified Plaintiff's diagnoses as bipolar disorder, mixed, with psychotic features along with a personality disorder and polysubstance dependence; he assigned Plaintiff a GAF of 60. *Id.*

Examining physician Dr. Holton reported on July 27, 1999, that Plaintiff had an antalgic gait favoring the right lower extremity with slowing and occasional lurching features, that he attempted to heel and toe walk but was markedly unstable, and that he had palpable tenderness of the lumbar paravertebral muscles with some guarding of the hips on active range of motion. (Tr. 372-75). Dr. Holton also reported that Plaintiff showed diminished muscle strength and tone of the right lower extremity, had no evidence of significant extremity atrophy, that there was spasm evident in the lumbar paravertebrals, normal reflexes, and that there was a sensory loss of the left lower extremity which did not definitely correspond to a dermatomal distribution. *Id.* Dr. Holton identified Plaintiff's diagnoses as chronic low back pain, status post lumbar hemi-laminectomy, bi-polar disorder, generalized seizure disorder, and history of suicide attempts. *Id.*

Plaintiff presented to Dr. Merkle eighteen times between January, 2004, and March, 2005, primarily for medication management for back pain and bipolar disorder. (Tr. 687-717). During that time, Dr. Merkle reported that Plaintiff had a normal range of neck motion, normal neurological findings, and normal station and gait. *Id.* Dr. Merkle noted in February, 2004, that Plaintiff reported that he was depressed. (Tr. 712). In May, 2004, Dr. Merkle reported that Plaintiff was permitted to use only a single pharmacy because he had a history of requesting drugs from multiple places. (Tr. 703). Dr. Merkle terminated Plaintiff from the practice in April, 2005, due to violation of his controlled substances agreement. (Tr. 686).

The record reveals that Plaintiff presented to the emergency room numerous times between April, 2004, and November, 2005, for treatment of various complaints including headache, abdominal pain, back pain, and withdrawal from pain medication. (Tr. 453-656). Plaintiff reported in August, 2005, that his back pain was worse when sitting and after he returned home from work,

and that he had less pain if he was standing up at work. (Tr. 474).

Examining psychologist Dr. Berry noted in May, 2005, that Plaintiff reported that he had a long history of polysubstance abuse and admitted that he had a drug addiction problem, that he currently used downers, speed, heroin, acid, inhalants, alcohol, marijuana, his and others' prescription medications, and crack cocaine which was his drug of choice. (Tr. 387-89). Dr. Berry also noted that Plaintiff had been convicted of theft by deception specific to securing and submitting multiple prescriptions from physicians and pharmacies, that he served one and one-half years on a six year sentence, and that his probation ended in 1999. *Id.* Dr. Berry also noted that Plaintiff was oriented, had difficulty with simple arithmetic, enjoyed working on cars, completed the ninth grade in special education, and that his mood was primarily euthymic with odd affective expression. *Id.* Dr. Berry reported that Plaintiff had a "dull" IQ, possibly selectively feigned, was an obfuscated historian, and that his speech was primarily relevant, goal oriented, and future oriented. *Id.* Dr. Berry identified Plaintiff's diagnoses as polysubstance abuse with psychological dependency, opioid abuse with psychological dependency, bipolar disorder NOS, and personality disorder NOS. *Id.* Dr. Berry was unable to determine Plaintiff's GAF. *Id.*

Plaintiff received treatment at Open Door/BMH Health Center during the period May 31 through October 6, 2005, for various complaints including low back pain, right hip pain, depression, anxiety, and grief due to his girlfriend's death. (Tr. 408-22). During that time, Plaintiff's health care providers reported that Plaintiff had a positive straight leg raising test on the left; reduced right hip, foot, and knee flexibility; tenderness in the lumbar spine at L2-L5; and right hip pain especially with rotation. *Id.* On July 28, 2005, Plaintiff complained of anxiety, grief due to the death of his girlfriend, and depression; his health care provider referred Plaintiff to Comprehensive

Mental Health Services (CMHS). *Id.*

Plaintiff received mental health treatment at CMHS during the period October 19, 2005, to February 14, 2006. (Tr. 657-63). At the time of his initial evaluation, it was noted that Plaintiff's diagnoses were cocaine dependence, cannabis dependence, and major depressive disorder recurrent and mild, and that his GAF was 40. *Id.* In January 2006, Plaintiff's mental health care provider noted that Plaintiff reported that, on his own, he had doubled his bipolar medication dosage, that his mood had improved, that his sleep was improved with Zoloft, and that his hallucinations were not "as bad". *Id.* The mental health care provider also noted that Plaintiff was stable and improving with no psychosis or delusional thinking. *Id.* On February 14, 2006, Plaintiff reported that he was experiencing increased insomnia and anxiety. *Id.*

The record contains a copy of Plaintiff's treatment notes from orthopedist Dr. Haller dated March, 2001, through April, 2007. (Tr. 793-820). During that time, Dr. Haller treated Plaintiff for non-radicular low back pain with right hip pain, an apparent short right leg, neck pain, paresthesias of unclear etiology, and a right fifth finger injury for which Plaintiff underwent surgical treatment. *Id.* On January 17, 2006, Dr. Haller noted that Plaintiff reported that he had been seen and followed at the Open Door Clinic, but that he was discharged from that practice because he violated his contract. *Id.* Dr. Haller also noted that Plaintiff seemed to be uncomfortable with range of cervical motion, had some tenderness to palpation to the left sided paracervical muscles and across the upper trapezius levator scapular region. *Id.* An EMG of Plaintiff's left arm was normal. (Tr. 796). Dr. Haller identified Plaintiff's diagnosis as left arm pain and paresthesias, questionable cervical radiculopathy. *Id.* Dr. Haller prescribed Vicodin, but refused to prescribe routine narcotics. *Id.* In April 2007, Plaintiff saw, Dr. Haller, for his leg length discrepancy and he recommended a

new orthotic. (Tr. 793).

In October, 2006, Plaintiff sought emergency room treatment for complaints of facial pain and numbness which he reported had started when he was hit in the head at work with a steel beam. (Tr. 673-75). In November 2006, Plaintiff sought emergency room treatment for complaints of a three-day history of chest pain. (Tr. 669-72). The emergency room health care provider noted that Plaintiff was a mechanic and was involved in heavy lifting and that he did not report chest pain while working *Id.*

Plaintiff consulted with family physician Dr. Pyle on January 11, 2007, who reported that Plaintiff complained of migraine headaches, low back problems, and facial numbness. (Tr. 677–84). Dr. Pyle also reported that Plaintiff walked with a little bit of a limp favoring his left leg and she recommended pain and neurological evaluations. *Id.* Dr. Pyle noted that Plaintiff sought a refill for pain medication that he had been taking for ten years, that she thought that was excessive, and that she had "the idea that he will be using me to get disability transferred from Indiana to Ohio." *Id.* Dr. Pyle reported on February 15, 2007, that Plaintiff had a normal mental status, was not confused, had normal activities of daily living, and was grossly intact with only a slight limp in the left leg. *Id.*

Consulting neurologist Dr. Kitchener saw Plaintiff in January, 2007, due to complaints of chronic headaches and neck pain as well as a history of seizures. (Tr. 763-66). Dr. Kitchener reported that Plaintiff had normal motor strength, 2/4 reflexes, and a positive Hoffman's sign on the left, that Plaintiff was in a pleasant mood and had an appropriate affect, and that the remainder of his neurological examination was normal. *Id. Id.* Dr. Kitchener ordered an MRI of Plaintiff's cervical spine which revealed mild degenerative disc disease at the C3-C4 and C4-C5

11

levels, and bulging and annular tears with no evidence of disc herniation, spinal stenosis, or cord compression. (Tr. 758, 766). An EMG of Plaintiff's arms was normal. (Tr. 760). Dr. Kitchener reported that Plaintiff probably had cervical spondylosis. (Tr. 765). Dr. Kitchener noted that he suspected the seizures may have been stress-induced and that Plaintiff's headaches were likely "rebound" headaches from opiate medications. *Id.*

A February 16, 2007, EMG of Plaintiff's arms was normal. (Tr. 760). A February 21, 2007, MRI of Plaintiff's cervical spine revealed mild degenerative disc disease involving C3-4 and C4-5 levels with disc desiccation, concentric bulging of the disc and annular tears without evidence of disc herniation or spinal stenosis. (Tr. 758).

The record contains a copy of Plaintiff's treatment notes from family physician, Dr. Rashid dated March 7, 2007, through July 26, 2007. (Tr. 875-93). During that time, Dr. Rashid treated Plaintiff for complaints of depression, anxiety, epilepsy, COPD, and back, neck, and knee pain. *Id.*

In May 2007, Plaintiff consulted with pain management specialist Dr. Smith who reported that Plaintiff described mild pain across his neck, his most significant pain was across his lumbar spine radiating to his right leg, and that he had an antalgic gait. (Tr. 853-55). Dr. Smith also reported that Plaintiff's diagnoses were status post laminectomy syndrome and chronic opioid dependence. *Id.* Dr. Smith noted that Plaintiff was not taking more than six Vicodin a day, that it was reasonable to continue Plaintiff on his current medication regimen, and that Plaintiff should do so through his primary care physician, Dr. Rashid. *Id.*

The record contains Plaintiff's treatment notes from the Miami County Mental Health Center dated April 18 through June 28, 2007. (Tr. 824-852). At the time of his initial evaluation, it

was noted that Plaintiff was self-referred, complained of depression and anxiety, that he was depressed and anxious, had a full affect, had poor insight and judgment, reported that he was a recovering alcoholic, had tried marijuana once or twice but never liked it, and that he admitted to a history of crack cocaine abuse and dependence as well as narcotic abuse and dependence. *Id.* Plaintiff's diagnoses were identified as major depressive disorder recurrent and moderate, anxiety disorder NOS, cocaine dependence in early full remission per report, and alcohol dependence in sustained full remission per report; he was assigned a GAF of 57. *Id.* Plaintiff attended five counseling sessions and last saw a therapist in June 28, 2007, at which time it was noted that Plaintiff's mood and affect were normal, his thought processes were normal, and that he reported he did not think the counseling was doing him any good and that since he saw his medical doctor for anti-depressants and his pastor for counseling services, he wanted to be discharged from the community mental health system. *Id.*

The transcript contains a copy of Plaintiff's hospital admission record dated January 17, 2008, which Plaintiff submitted to the Appeals Council. (Tr. 918). That record reveals that Plaintiff underwent a microscopic lumbar laminectomy with bilateral diskectomy at L5-S1, and that the day after surgery, Plaintiff was doing well and was walking the halls with decreased pain. *Id.*

In his Statement of Errors, Plaintiff essentially alleges that the Commissioner erred by improperly relying on an isolated GAF score of 57 to find that there was medical improvement and by failing to find that he was entirely credible. (Doc. 7). Plaintiff also argues that this matter should be remanded pursuant to Sentence 6 for consideration of new and material evidence. *Id.* The Court will address Plaintiff's remand argument first.

The remand provision of 42 U.S.C. §405(g) provides that the court may order a case

remanded to the Commissioner for further consideration "only upon a showing that there is new evidence which is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. §405(g); *see also, Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1233 (6th Cir. 1993).

The court may review new evidence submitted after the Administrative Law Judge's decision for the limited purpose of determining the appropriateness of a remand to the Commissioner under sentence six of 42 U.S.C. §405(g). *Wyatt v. Secretary of Health and Human Services,* 974 F.2d 680, 685 (6th Cir. 1992). Such remand is appropriate, however, only if the court finds that the evidence is new and material and there is good cause for the failure to incorporate that evidence into the record of the prior proceeding. *Sizemore v. Secretary of Health and Human Services,* 865 F.2d 709, 711 (6th Cir. 1988).

To establish materiality, the plaintiff must show, "a reasonable probability that the Commissioner would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore,* 865 F.2d at 711 (citations omitted). New evidence on an issue already fully considered by the Commissioner is cumulative and is not sufficient to warrant remand of the matter. *Carroll v. Califano,* 619 F.2d 1157, 1162 (6th Cir. 1980). Additional evidence is material only if it concerns the plaintiff's condition prior to the Commissioner's decision. *Oliver v. Secretary of Health and Human Services,* 804 F.2d 964, 966 (6th Cir. 1986). Evidence of a subsequent deterioration or change in the plaintiff's condition after the administrative hearing is deemed immaterial. *Wyatt,* 974 F.2d at 685, *citing, Sizemore,* 865 F.2d at 712.

To show good cause, plaintiff must present some justification for the failure to have acquired and presented such evidence to the Commissioner for inclusion in the record during the

hearing before the Administrative Law Judge. *See, Willis v. Secretary of Health and Human Services,* 727 F.2d 551 (6th Cir. 1984); *see also, Oliver, supra.* Additional evidence generated for the purpose of attempting to prove disability in contrast to evidence produced by continued medical treatment does not meet the good cause requirement of the Act. *Koulizos v. Secretary of Health and Human Services,* No. 85-1654 (6th Cir. Aug. 9, 1986) (table 802 F.2d 458).

First, it is questionable, at best, as to whether Plaintiff has satisfied the "good cause" requirement for remand. The administrative hearing took place on August 20, 2007, at which time Plaintiff testified that he was going to see a "spine surgeon" a week after the hearing. (Tr. 928). In addition, Judge Redmond left the record open so that Plaintiff could submit additional evidence. (Tr. 921-22). Judge Redmond did not issue his decision until November 27, 2007, three months later. However, during that period although Plaintiff apparently submitted additional evidence from Drs. Kitchener, Pyle and Rashid[1], there is no evidence from a "spine surgeon" or any indication in the records submitted that Plaintiff would undergo spine surgery.

However, even assuming that Plaintiff has satisfied the "good cause" requirement for remand, this Court concludes that Plaintiff has failed to satisfy the "materiality" requirement for remand. The fact that Plaintiff underwent a microscopic lumbar laminectomy would not have altered Judge Redmond's decision because the cause of the pain is not the focus of Judge Redmond's decision. In other words, the analysis of Plaintiff's allegations of pain does not turn on whether the alleged pain was caused by degenerative disc disease or a herniated disc. In addition, and perhaps more importantly, the additional evidence reveals that Plaintiff tolerated the surgery well and that the day after surgery, Plaintiff was doing well, was up and walking, and reported decreased pain.

---

[1] See FAX date and time stamps on transcript pages 898A through 916.

Stated differently, the additional evidence does not provide a basis for requiring the conclusion that Plaintiff was *more* restricted post-operatively than he was at the time Judge Redmond issued his decision.

In support of his first Error, Plaintiff argues that the Commissioner erred by relying on his GAF of 57 in finding that he experienced medical improvement and is not disabled by his mental impairment. Plaintiff essentially argues that when the Commissioner determined he was disabled as of April 1, 1999, his GAF was 60 and therefore a GAF of 57 could not indicate medical improvement.

Contrary to Plaintiff's argument, Judge Redmond considered all of the evidence, not simply his GAF, in determining that he is not disabled. (Tr. 20-25). For example, Judge Redmond noted that since the CPD, no medical source opined that Plaintiff is disabled from all work activity. In addition, Judge Redmond noted that Plaintiff's mental health treatment has been sporadic, that he engages in a wide variety of activities, and that the record indicates that Plaintiff was an unreliable historian.

Indeed, as noted above, Dr. Berry reported that although Plaintiff demonstrated a dull IQ, it was possibly selectively feigned, that Plaintiff was a obfuscated historian, and that he was oriented, and his speech was normal. In addition, although Plaintiff frequently received treatment from Dr. Merkle for numerous physical complaints, he discussed his alleged mental impairment infrequently. Similarly, Plaintiff's treatment at Open Door primarily centered around his physical complaints and he complained of anxiety, grief, and depression due to his girlfriend's death on only one occasion. Further, Plaintiff received only short-term mental health treatment at CMHS during the period October, 2005, through February 14, 2006, as well as short-term treatment at Miami

County Mental Health Center during April, May, and June, 2007. Moreover, Plaintiff told his mental health care providers at Miami County Mental Health Center that he did not think that he was benefitting from counseling and that he wanted to be discharged from the mental health system. The record also indicates that Plaintiff did not receive any mental health treatment during the period February, 2006, and April, 2007.

In addition to his short and sporadic mental health treatment, contrary to Plaintiff's testimony, a review of the record reveals that Plaintiff engages in a wide range of activities. For example, Plaintiff is independent with self-care, is able to prepare simple meals, performs household chores such as washing dishes, doing laundry, vacuuming, going shopping, handling his own finances, reading the newspaper, using a computer, and attending church. (Tr. 185-91). Additionally, as noted above, the record indicates that Plaintiff enjoys working on cars and that he worked as a mechanic. (Tr. 669-72; 673-75).

Finally, the opinions of the reviewing mental health experts supports Judge Redmond's conclusion that as of the CPD, Plaintiff experienced medical improvement and that he was not disabled. (Tr. 433-48; 443-57).

Under these facts, the Commissioner properly considered all the evidence of record and had an adequate basis for determining that as of the CPD Plaintiff experienced medical improvement and that he was not disabled.

Plaintiff argues next that the Commissioner erred by failing to find that he was entirely credible. Plaintiff's position is that Judge Redmond misread an MRI report and therefore his assessment of Plaintiff's back pain was erroneous. The Commissioner seems to concede that Judge Redmond did, in fact, misinterpret the June, 2007, MRI report but argues that it was, at worst,

harmless error.  (Doc. 10 at 16).

In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition.  *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247, (6th Cir. 2007).  Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain.  *Rogers, supra* (citations omitted).  First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.  *Id.* (citation omitted).  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities, *Id.*  Stated differently, there is a two-step process for evaluating pain.  First, the individual must establish a medically determinable impairment which could reasonably be expected to produce the pain.  *See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991), *citing, Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986).  Second, the intensity and persistence of the alleged pain are evaluated by considering all of the relevant evidence.  *See, Jones,* 945 F.2d at 1366-70.

The measure of an individual's pain cannot be easily reduced to a matter of neat calculations.  *Jones, supra*. There are no x-rays that can be taken that would objectively show the precise level of agony that an individual is experiencing. *Id.* Hence, in evaluating the intensity and persistence of pain, both physicians and laymen alike, must often engage in guesswork.  *Id.*  The Commissioner's own guidelines acknowledge the most inexact nature of this evaluation:

> Medical history and objective medical evidence such as evidence of
> muscle atrophy, reduced joint motion, muscle spasm, sensory and

motor disruption, are usually reliable indicators from which to draw reasonable conclusions about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity. Whenever available this type of objective medical evidence must be obtained and must be considered in reaching a conclusion as to whether the individual is under a disability.

*Jones,* 945 F.2d at 1369-70, *quoting* S.S.R. 88-13.

In *Felisky v. Bowen,* 35 F.3d 1027, 1039-40 (6th Cir. 1994), the Court set out seven (7) factors which the ALJ is to consider when evaluating a claimant's subjective complaints. The Court derived those factors from 20 C.F.R. §404.1529(c)(3). *Id.* However, while the *Felisky* Court applied each of the factors in the case before it, *Felisky* does not require that the ALJ engage in such an extensive analysis in every decision. *Bowman v. Chater,* No. 96-3990, 1997 WL764419 at *4 (6th Cir. Nov. 26, 1997). It does require that in addition to objective medical evidence the ALJ consider non-medical factors. *Id.*

In determining that Plaintiff has the residual functional capacity to perform a limited range of light work in spite of his alleged back impairment, Judge Redmond reviewed and considered the evidence of record and concluded that Plaintiff was not entirely credible. (Tr. 21; 24-25). The medical sources of record have reported few *Jones* reliable indicators. The record reveals that Plaintiff has exhibited, at worst, positive straight leg raising, reduced flexibility, and tenderness of his lumbar spine. Indeed, Plaintiff's neurological findings have essentially been normal. In addition, the objective medical tests of record, specifically EMG and MRIs, have revealed, at worst, mild findings.

In evaluating Plaintiff's credibility, Judge Redmond identified and applied the relevant *Felisky* factors. (Tr. 24). As Judge Redmond noted, none of the medical sources of record have opined that Plaintiff is disabled due to his alleged back impairment. In addition, as noted

above, Plaintiff engages in a wide variety of activities. Further, the record reveals that Plaintiff had been convicted of theft by deception, has a long history of substance abuse, that he admittedly currently abused drugs, that he was an obfuscated historian, and that he possibly feigned his testing results. Finally, the record reveals that Plaintiff has admitted to health care providers that he was performing work activity.

Under these facts, the Commissioner had an adequate basis for rejecting Plaintiff's allegations of disabling pain and for determining that he was not entirely credible.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

July 10, 2009.

*s/ Michael R. Merz*
United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).